**PATTERSON LAW GROUP**
James R. Patterson (CA 211102)
402 West Broadway, 29th Floor
San Diego, California 92101
Telephone: 619.756.6990
Facsimile:  619.756.6991
jim@pattersonlawgroup.com

**CARPENTER LAW GROUP**
Todd D. Carpenter (CA 234464)
402 West Broadway, 29th Floor
San Diego, California 92101
Telephone:  619.756.6994
Facsimile:    619.756.6991
todd@carpenterlawyers.com

Attorneys for Plaintiffs

IN THE UNITED STATES DISTRICT COURT

FOR THE SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| SCOTT BURGHARDT, on behalf of himself and all others similarly situated,<br><br>        Plaintiff,<br><br>vs.<br><br>NUTRONICS LABS, INC., an Illinois Corporation, and Does 1 through 20,<br><br>        Defendants. | Case No.  '14CV0606 JM   BGS<br><br>CLASS ACTION<br><br>COMPLAINT FOR:<br>**1.**  VIOLATION OF CONSUMERS LEGAL REMEDIES ACT, CIVIL CODE § 1750, *et seq.*;<br>**2.**  VIOLATION OF THE UNFAIR COMPETITION LAW, BUSINESS AND PROFESSIONS CODE § 17200, *et seq.*; and<br>**3.**  BREACH OF EXPRESS WARRANTY.<br><br>DEMAND FOR JURY TRIAL |

Plaintiff Scott Burghardt brings this action on behalf of himself and all others similarly situated against Defendant Nutronics Labs, Inc. ("Nutronics") and Does 1 through 20 ("Does" or "Doe Defendants") (collectively "Defendants") and states:

## NATURE OF ACTION

1.     Defendants distribute, market, and sell IGF-1 Plus ("IGF-1 Plus") a line of deer antler velvet supplements that comes in spray and droplet forms and purportedly provides a variety of health benefits such as: promoting a powerful immune system; maintaining a healthy heart; promoting healthy flexible joints; promoting a healthy prostate; promoting sexual performance and function by raising libido; supporting healthy weight-loss regimens; and promoting healthy skin and reducing the appearance of wrinkles.  These claimed health benefits are the only reason a consumer would purchase IGF-1 Plus.   Defendants' advertising claims, however, are false, misleading, and reasonably likely to deceive the public.

2.     The primary active ingredient in the IGF-1 Plus products is insulin-like growth factor 1 ("IGF-1"), a peptide hormone that can be injected to increase total protein and DNA content in tissues. Through an extensive, uniform and long-term advertising campaign on the Internet, Defendants represent that spraying or placing IGF-1 Plus liquid droplets under the tongue helps people with active lifestyles "[a]chieve peak performance," "helps athletes and bodybuilders alike train harder, build lean muscle mass and speeds their recovery time," helps "boost your energy levels and your recovery time from a hard workout," "helps promote a healthy immune system and lean muscle mass," and "help[s] with general health and wellness."

3.     All available scientific evidence demonstrates that the IGF-1 Plus products' delivery methods are not effective in building lean muscle mass and speeding recovery time, promoting healthy flexible joints, or promoting sexual performance and function by raising libido.  Defendants do not have any competent, reliable, scientific evidence that substantiates their representations about the health benefits of consuming their IGF-1 Plus products, which are not injected but are sprayed or dropped into the mouth under the

tongue.  In fact, numerous scientifically valid studies have demonstrated that antler velvet is not effective in building muscle, speeding up recovery, promoting healthy joints, or raising libido.  The studies that have found benefits in using antler velvet are ones where it was administered via injection or where the subjects were not human, and many studies explicitly stated that further research was required to establish the effectiveness of antler velvet.  Even the link to WebMD provided on Nutronics's homepage and in its links to "Medical Reference" ("Click here to see what WebMD says about deer antler velvet") states under the Antler Velvet "Uses" tab that there is "Insufficient Evidence for: Boosting strength and endurance.  Muscle aches and pains.  Use as an aphrodisiac and for sexual problems.  Improving immune system function.  High cholesterol.  High blood pressure. Asthma. Indigestion.  Acne.  Cancer.  Other conditions."

4.     Defendants represent that the main ingredient in the IGF-1 Plus products, IGF-1, helps build lean muscle mass, speeds recovery time, encourages the absorption of both chondroitin and glucosamine sulfate which will helps in the promotion of healthy joints, and increases libido, thereby enhancing consumers' sex drives.  The Nutronics webpage states the following:

(a)   "IGF-1 Plus™ is the only all natural supplement known to man that is steroid free, safe, and increases muscle size in athletes.  There has never been a supplement that builds muscle while improving recovery.  IGF-1 Plus™ stops the breakdown of muscle while naturally burning fat with no stimulants."

(b)   "IGF-1 Plus™ = Muscle Increase and Power."

(c)   "Nutronics Labs IGF-1 Plus™ deer antler spray has anti-aging qualities that help to dramatically slow down the biological aging process, and helps reduce the appearance of wrinkles in addition to helping to repair cells damaged by the sun and aging."

(d)   Consuming the IGF-1 Plus products "can improve athletic performance by increasing strength, endurance (stamina), increasing oxygen carrying

capacity of the blood, repairing minor tissue damage that occurs either during training or in a competitive event and boosting the immune system," "helps promote healthy, flexible joints," "improves brain function and promotes a better night's sleep, thus improving energy levels," and "helps promote sexual performance and function by raising libido."

(e)   "Deer Antler Extract that is formulated into Nutronics Labs IGF-1 Products allow for 98% absorption through our proprietary liposome delivery system."   *See,* http://www.nutronicslabs.com/nutronics-labs-super-max-200k-deer-antler-velvet-spray/?gclid=CMnxlavdkr0CFcRi7AodsWsAIw   (Last visited, March 14, 2014.)

Attached as Exhibit A.  These statements explicitly and implicitly represent that the IGF-1 Plus products are intended to improve muscle mass, speed recovery time, promote healthy flexible joints, and enhance sexual performance.

5.   Defendants convey their uniform, deceptive message to consumers through online promotional materials and Defendant Nutronics's website, which is the point of purchase—IGF-1 Plus is not readily available in stores or through other vitamin/supplement websites.  Consumers are exposed to the representations regarding the IGF-1 Plus products because they must visit Defendant Nutronics's website to purchase the IGF-1 Plus products.  The only reason a consumer would purchase IGF-1 Plus is to obtain the advertised health benefits, which the IGF-1 Plus products are incapable of providing.

6.   As a result of Defendants' deceptive advertising and false claims regarding the efficacy of the IGF-1 Plus products, Plaintiff and the proposed Class have purchased a product which does not perform as represented, and they have been harmed in the amount they paid for the product, which, in the case of Plaintiff Scott Burghardt is approximately $119.99 per bottle.

7.     Plaintiff brings this action on behalf of himself and other similarly situated consumers who have purchased the IGF-1 Plus products to halt the dissemination of this false, misleading, and deceptive advertising message, correct the false and misleading perception it has created in the minds of consumers, and obtain redress for those who have purchased the products.  Based on violations of California's unfair competition laws and Defendants' breach of express warranty, Plaintiff seeks injunctive and monetary relief for consumers who purchased the IGF-1 Plus products.

## JURISDICTION AND VENUE

8.     This Court has original jurisdiction pursuant to 28 U.S.C. § 1332(d)(2).  The matter in controversy, exclusive of interest and costs, exceeds the sum or value of $5,000,000, and it is a class action in which there are in excess of 100 class members, many of whom are citizens of a state different from Defendants.

9.     This Court has personal jurisdiction over Defendants because Defendants are authorized to conduct and do conduct business in California.  Defendants have marketed, promoted, distributed, and sold the IGF-1 Plus products in California, and Defendants have sufficient minimum contacts with this State and/or sufficiently avail themselves of the markets in this State through their promotion, sales, distribution, and marketing within this State to render the exercise of jurisdiction by this Court permissible.

10.     Venue is proper under 18 U.S.C. § 1965(a) because Defendants transact substantial business in this District and Defendants market, distribute and sell the IGF-1 Plus products in this District.

## PARTIES

11.     Plaintiff Scott Burghardt resides in Butte County, California.    In approximately April 2013, Plaintiff purchased his first bottle of Defendants' IGF-1 Plus Maximum 100,000ng from Defendants' website at http://www.nutronicslabs.com.  At the time of his purchase he was exposed to, read, and relied upon Defendants' representations regarding the health benefits of the IGF-1 Plus products by reading the IGF-1 Plus product description on Defendants' website.  Plaintiff purchased the IGF-1 Plus product in

reliance on the claims listed on the product description detailed herein and above, that IGF-1 Plus products would "improve athletic performance by increasing strength, endurance (stamina), increasing oxygen carrying capacity of the blood, repairing minor tissue damage that occurs either during training or in a competitive event and boosting the immune system," "promote healthy, flexible joints," and "promote sexual performance and function by raising libido."  He paid approximately $119.99 for the product on Defendants' website.  Mr. Burghardt consumed the product regularly, as directed, but did not experience the intended, advertised benefits.  As a result of his purchase, Plaintiff suffered injury in fact and lost money.  Had Plaintiff known the truth about Defendants' misrepresentations and omissions, he would not have purchased the IGF-1 Plus products. Plaintiff Burghardt is not claiming physical harm or seeking the recovery of personal injury damages.

12.     Defendant Nutronics Labs, Inc. is incorporated under the laws of the state of Illinois.  Nutronics's corporate headquarters is located at 85 NE Loop 410, Suite 616, San Antonio, Texas 78216.   Nutronics researches, develops, manufactures, distributes, markets, and sells its IGF-1 Plus products to tens of thousands of consumers in California and throughout the United States.

13.     The true names and capacities, whether individual corporate, associate, or otherwise, of defendants sued herein as Does 1 through 20, inclusive, are currently unknown to Plaintiff.

14.     Plaintiff is informed and believes, and based thereon alleges, that each of the defendants designated herein as a Doe is legally responsible in some manner for the unlawful acts referred to herein.  Plaintiff will file the requisite motion with this Court to amend this Complaint to reflect the true names and capacities of the defendants designated hereinafter as Does when such identities become known.

15.     Plaintiff is informed and believes, and thereon alleges, that at all times material hereto and mentioned herein, each defendant sued herein, was the agent, servant, employer, joint venturer, partner, division owner, subsidiary, division, alias, and/or alter

ego of each of the remaining defendants and were, at all times, acting within the purpose and scope of such agency, servitude, employment, ownership, subsidiary, alias and/or alter ego and with the authority, consent, approval, control, influence, and ratification of each remaining defendant sued herein.

## FACTUAL ALLEGATIONS

### *The IGF-1 Plus products*

16.    Defendants manufacture, distribute, market, and sell the IGF-1 Plus line of health supplements on a nationwide basis.

17.    Defendants presently offer six forms of the IGF-1 Plus products: (a) Super Max 200,000ng; (b) Maximum 100,000ng; (c) Ultra Plus 25,000ng; (d) Ultra 10,000ng; (e) Starter Plus 5,000ng; and (f) Starter 3,000ng. The products are nearly identical in their chemical composition: they each contain deer antler velvet (cervidae parvum comu) and stevia extract (leaves).  The only differences are the amounts of deer antler velvet and stevia extract, and that the Super Max and Maximum IGF-1 Plus products come in a dropper form rather than a spray.  The advertising and marketing messages for the products are nearly identical.  *See* Exhibit A.  All IGF-1 Plus products claim to have clinically tested components, and all products claim they build lean muscle mass, speed recovery time, promote healthy joints, and increase libido.  *Id.*  Plaintiff alleges that the actual quantity of deer antler velvet in any of the products is irrelevant because it is completely ineffectual when delivered to the human body in the droplet form.

18.    The IGF-1 Plus products are sold throughout California and the United States via the Nutronics website.

19.    Since the launch of the IGF-1 Plus products, Defendants have consistently conveyed the message to consumers throughout California and nationwide that the IGF-1 Plus products ingredients will help "build lean muscle mass and speed[] their recovery time," "boost your energy levels," and "promote sexual performance and function by raising libido."  While the main component of the IGF-1 Plus products, IGF-1, has been

shown to provide some health benefits, these studies involved nonhuman test subjects or different delivery methods (i.e., injection).  *See infra* ¶¶ 33-34.  The statements regarding the benefits of the IGF-1 Plus products in humans have been proven false by multiple, reputable, published scientific studies.  *See infra* ¶¶ 27-32.  As more fully set forth herein, the scientific evidence regarding the use of IGF-1 demonstrates that the IGF-1 Plus products do not provide ***any*** of the health benefits represented by Defendants.

20.    In addition to the primary ingredient Defendants prominently display on the Nutronics website and diligently promote as providing the purported health benefits, the IGF-1 Plus products also contain miniscule amounts of other ingredients.  These other minor ingredients are not effective in providing the health benefits represented by Defendants.  In any event, the focus is on the uniform false and deceptive representations and omissions that Defendants make about the IGF-1 Plus products on Defendant Nutronics's website.

21.    There is no competent scientific evidence that taking the IGF-1 Plus products through Defendant Nutronics's "proprietary liposome delivery system" results in the body absorbing 98% of the product (as claimed by Defendants) or metabolizing the product into something that provides the advertised health benefits.

22.    The primary active ingredient in all of the IGF-1 Plus products is insulin-like growth factor 1, or IGF-1.  IGF-1 is a peptide hormone, or protein, that has a function and structure similar to insulin[1].  It is a member of a family of proteins that are involved in mediating growth and development. *Id.* Contrary to Defendant's claims, IGF-1 can only be *injected* to have any effect; and even then, it's only known effects are to increase total protein and DNA content in tissues, not provide the miracle benefits advertised and represented by Defendants.

23.    Similar to insulin for a diabetic, insulin is injected into the blood stream and regularly managed with the assistance of a blood-sugar monitor. Drinking insulin, or

---

[1] *See* http://www.ncbi.nlm.nih.gov/gene/3479 and http://www.ncbi.nlm.nih.gov/pubmed/18236437

ingesting it in liquid form through a dropper placed under the tongue is completely ineffective; it simply does not survive the digestion or physiological process of ingestion.

24.     Contrary to the stated representations for all the IGF-1 Plus products on Defendant Nutronics's website, Defendants do not possess (and have not possessed) competent scientific evidence that their IGF-1 Plus products are effective in providing the advertised health benefits.

25.     Despite scientific studies which demonstrate that Defendants' claims are false and deceptive, and no scientifically valid confirmation that the IGF-1 Plus products are an effective health supplement, Defendants state on the Nutronics website that the IGF-1 Plus products "increase[] muscle size in athletes," "improve[e] recovery, "stop[] the breakdown of muscle while naturally burning fat," "help to dramatically slow down the biological aging process," "repair[] minor tissue damage . . . and boost[] the immune system," "help[] promote healthy, flexible joints," and "help[] promote sexual performance and function by raising libido."

26.     Defendants knew or should have known that IGF-1, as it exists in the IGF-1 Plus products and through the delivery mechanism of a "dropper", does not provide any of the warranted benefits as represented by Defendants on the Nutronics website.  In fact, the studies finding that IGF-1 *may* have beneficial properties involved nonhuman test subjects or different delivery and concluded that further research was required to establish the effectiveness of Antler Velvet in humans.  *See infra* ¶¶ 33-34.

27.     Independent studies confirm that the representations made on the Nutronics website regarding the IGF-1 Plus products, relied upon by Plaintiff in making his purchases, are false and misleading.  Despite knowledge of these studies, Defendants continued to make the described representations, misleading Plaintiff and members of the Class into believing the IGF-1 Plus products had proven efficacy and would provide the benefits described in their advertising.

28.     For example, a recent study by Gilbey, et. al, entitled *Health benefits of deer and elk velvet antler supplements: a systematic review of randomised controlled*

*studies*, 125(1367):80-6 NZ Med. J. (Dec. 14, 2012), found that there were <u>no beneficial</u> <u>effects</u> of deer or elk antler velvet supplements (emphasis added).  The study identified seven randomized controlled studies ("RCTs") that examined the effectiveness of velvet antler for rheumatoid arthritis (two RCTs), osteoarthritis (one RCT), sexual function (one RCT), and sporting performance enhancement (three RCTs).  The study found that the two RCTs that reported some positive effects of deer and elk velvet antler supplements were not convincing, and the remaining five RCTs found that velvet antler supplements had no effect.  The study also concluded that "[c]laims made for velvet antler supplements do not appear to be based upon rigorous research from human trials, although for osteoarthritis the findings may have some promise."  Not surprisingly, Defendants did not cite this study on the Nutronics website.

29.    In 2008, 168 people with stage 2 to 3 rheumatoid arthritis participated in a six-month, randomized, triple-blind, placebo-controlled clinical trial.  The scientists concluded that "there were no statistically significant differences between groups," and "[o]verall, elk velvet antler does not effectively manage residual symptoms in patients with rheumatoid arthritis."  *See* Allen et al., *A randomized clinical trial of elk velvet antler in rheumatoid arthritis*, 9(3):254-61 Biol. Res. Nurs. (Jan. 2008).

30.    A 2005 study examined the effect of elk velvet antler supplementation ("EVA") on forty-six male and female rowers during ten-weeks of training by placing the rowers into two groups: one group received 560 mg of EVA a day, and the other received placebo.  The rowers' maximal oxygen uptake, 2,000-meter rowing time, and leg and bench press strength were measured before and after weeks five and ten, and their serum hormone levels were measured before and five and sixty minutes after a simulated 2000-meter race.  The study held that there was no significant difference between the group receiving the antler supplement and the placebo group for any hormonal response, and concluded: "It appears that 10 wk of EVA supplementation does not significantly improve rowing performance nor alter hormonal responses at rest or after acute exercise than training alone."  *See* Syrotuik, et al., *Effect of elk velvet antler supplementation on the*

*hormonal response to acute and chronic exercise in male and female rowers*, 15(4):366-85 Int. J. Sport Nutr. Exerc. Metab. (Aug. 2005).

31.    A 2003 study involving 38 subjects by Sleivert, et al., entitled *The effects of deer antler velvet extract or powder supplementation on aerobic power, erythropoiesis, and muscular strength and endurance characteristics*, 13(3):251-65 Int. J. Sport Nutr. Exerc. Metab. (Sept. 2003), randomly assigned active males in a double-blind fashion to deer antler velvet extract, deer antler powder, or placebo groups.  The subjects were all measured for circulating levels of, inter alia, insulin-like growth factor.  All groups improved strength equivalently, but the powder group demonstrated a greater increase in isokinetic knee extensor strength and endurance compared to placebo group.  The study held that "[t]hese findings do not support an erythropoetic or aerobic ergogenic effect of deer antler velvet. Further, the inconsistent findings regarding the effects of deer antler velvet powder supplementation on the development of strength suggests that further work is required to test the robustness of the observation that this supplement enhances the strength training response and to ensure this observation is not a type I error."

32.    In June 2003, a study by Conaglen, et al., entitled *Effect of deer velvet on sexual function in men and their partners: a double-blind, placebo-controlled study*, 32(3):271-8 Arch. Sex. Behav. (June 2003), studied 32 men (45-65 years old) and their partners in a twelve-week, double-blind, placebo-controlled trial of deer velvet.  The study found that "[t]here were no significant differences in the sexual behavior of the men taking deer velvet compared with the men taking placebo capsules," and "[t]here were no significant hormone changes from baseline to the end of the study in either group of men."  In conclusion, the scientists determined "that in normal males there was no advantage in taking deer velvet to enhance sexual function."

33.    A 2000 study stated that "age-related changes in cellular and tissue function are linked to decreases in IGF-1, and found "[t]he beneficial role of . . . IGF-1 in ameliorating vascular and brain ageing [is] counterbalanced by [its] well-recognised roles in age-related pathogenesis."  The study concluded that while research is still evolving, it

is likely that a decrease "in growth hormone and IGF-1 with age have both beneficial and deleterious effects."  *See* Sonntag et al., *The effects of growth hormone and IGF-1 deficiency on cerebrovascular and brain ageing*, 197(Pt 4): 575-585 J. Anat. (Nov. 2000).

34.   Defendant Nutronics's website refers to approximately twenty-nine studies, books, and articles, supposedly in scientific support of Defendants' health-benefit claims regarding the IGF-1 Plus products.  But the dates of these citations range from 1956 to 2006, and twenty-two of them are at least twenty years old.[2]  Moreover, none of them provides support for Defendants' claims.   Defendants' citations can be briefly summarized and dismissed as follows: two books simply state the uses of Chinese herbal medicine;[3] three citations are regarding sexual or reproductive health, but antler velvet has been shown to have no effect on sexual function (*see infra* ¶ 30);[4] eight citations are regarding the effects of cartilage (typically bovine or shark cartilage), not antler velvet;[5]

---

[2] The remaining citations are seven to nineteen years old (dates range from 1994 to 2006).  (The date for one citation could not be found, but it was cited by Craig Weatherby & Leonid Gordin, The Arthritis Bible (1999)).

[3] Hson-Mon Chang, Pharmacology and Applications of Chinese Materia Medica (Paul Pui-Hay But ed., Sih-Cheng Yao et al. trans., World Scientific Publ'g Co. 1987); D. Bensky et al., Chinese Herbal Medicine Materia Medica (1986).

[4] J. Falloon & P. Wellington, The Deer Farmer 2 (Trevor Walton ed., New Zealand 1992); Richard F. Spark, Male Sexual Health: A Couple's Guide (4th ed. 1993); Ge et al., *Effects of ginsenosides and pantocrine on the reproductive endocrine system in male rats*, 6(4):301-4 J. Tradit. Chin. Med. (Dec. 1986).

[5] Houck et al., *The Inhibition of Inflammation and Acceleration of Tissue Repair by Cartilage Powder*, 51:632-8 Surgery (May 1962); Prudden et al., *The biological activity of bovine cartilage preparations. Clinical demonstration of their potent anti-inflammatory capacity with supplementary notes on certain relevant fundamental supportive studies*, 3(4):287-321 Semin. Arthritis Rheum. (Summer 1974); Prudden et al., *The clinical acceleration of healing with a cartilage preparation; a controlled study*, 3;192:352-6 JAMA (May 1965); Prudden et al., *The Acceleration of Wound Healing with Cartilage-1*, Surg. Gynecol. Obstet. (Sept. 1957); Alex Duarte, Jaws For Life: The Story of Shark Cartilage 18 (1993); Prudden, *The treatment of human cancer with agents prepared from bovine cartilage*, 4(6):551-84 J. Biol. Response Mod. (Dec. 1985); Prudden, *General Description of Catrix, Summary of Dosage Forms and the Results of Catrix Therapy*, The Journey (a private publication of the Foundation for Cartilage and Immunology Research) [no date available]; Prudden et al., *The acceleration of healing*, 128(6):1321-6 Surg. Gynecol. Obstet. (June 1969).

four citations are regarding the effects of glucosamine or chondroitin, not antler velvet;[6] two citations are about the treatment of arthritis and osteoarthritis with drugs, not antler velvet;[7] one study is about the absorption of orally administered chondroitin, and it held that certain amounts of absorbed chondroitin were distributed in tissues and organs, but the major portions were excreted by the body;[8] four studies are about antler velvet's or IGF-1's effect on aging, but there are both positive and negative consequences of decreased IGF-1 levels;[9] four studies are merely about the possible functions of the IGF-1 hormone;[10] and one study provides a background of the antler-velvet industry and research findings that are at least nine years old.[11]

35.     Likewise, other studies that have found beneficial effects of IGF-1 used nonhuman test subjects, demonstrated that the delivery methods used by Defendants' IGF-1 Plus products are not effective, concluded that further investigation of IGF-1 is

---

[6] Roden, *Effect of hexosamines on the synthesis of chondroitin sulfuric acid in vitro*, 10:345–352 Arkh Kemi. (1956); Karzel et al., *Effects of hexosamine derivatives and uronic acid derivatives on glycosaminoglycane metabolism of fibroblast cultures*, 5(6):337-45 Pharmacology (1971); Setnikar et al., *Antireactive properties of glucosamine sulfate*, 41(2):157-61 Arzneimittelforschung (Feb. 1991); Bollet, *Stimulation of protein--chondroitin sulfate synthesis by normal and osteoarthritic articular cartilage*, 11(5):663-73 Arthritis Rheum. (Oct. 1968).

[7] Jonathan S. Dixon, Second-Line Agents in the Treatment of Arthritis (Daniel E. Furst ed., CRC Press 1992); Rejholec, *Long-term studies of antiosteoarthritic drugs: an assessment*, 17(2 Suppl. 1):35-53 Semin. Arthritis Rheum. (Nov. 1987).

[8] Lester M. Morrison & Katsumi Murata, Absorption, distribution, metabolism and excretion of acid mucopolysaccharides administered to animals and patients, Coronary Heart Disease and the Mucopolysaccharides (Charles C. Thomas, Publisher, Ltd. 1974).

[9] Wang et al., *Effects of repeated administration of deer antler extract on biochemical changes related to aging in senescence-accelerated mice*, 36(7):2587-92 Chem. Pharm. Bull. (Tokyo) (July 1988); Sonntag et al., *The effects of growth hormone and IGF-1 deficiency on cerebrovascular and brain ageing (supra ¶ 31,); Prinz et al., *Higher plasma IGF-1 levels are associated with increased delta sleep in healthy older men*, 50(4):M222-6 J. Gerontol A Biol. Sci. Med. Sci. (July 1995); Wang et al., *Stimulating effect of deer antler extract on protein synthesis in senescence-accelerated mice in vivo*, 36(7):2593-8 Chem. Pharm. Bull. (Tokyo) (July 1988).

[10] Amitai et al., *I-GF-1 signalling controls the hair growth cycle and the differentiation of hair shafts*, 126(9):2135 J. Invest. Dermatol. (Sept. 2006); Su et al., *Increased vibrissa growth in transgenic mice expressing insulin-like growth factor 1*, 112(2):245-8 J. Invest. Dermatol. (Feb. 1999); Tavakkol et al., *Expression of Growth Hormone Receptor, Insulin-Like Growth Factor 1 (IGF-1) and IGF-1 Receptor mRNA and Proteins in Human Skin*, 99:343–349 J. Invest. Dermatol. (1992); Jones et al., *Insulin-like growth factors and their binding proteins: biological actions*, 16(1):3-34 Endocr. Rev. (Feb. 1995).

[11] Suttie et al., *The New Zealand velvet antler industry: Background and research findings*, Proceedings of the Korean Symposium on Velvet Antler, Korean Society of Pharmacology (1994).

needed to determine its potential beneficial effects on the human body and/or suffered from bias.[12]

36.    Plaintiff and Class members have been, and will continue to be, deceived or misled by Defendants' deceptive representations touting the effectiveness of the IGF-1 Plus products.  Plaintiff purchased and used the IGF-1 Plus products during the Class Period and in doing so, read, considered and based his decisions to buy the IGF-1 Plus products on the above-cited website representations.  Because the IGF-1 Plus products' purpose is to build muscle, speed recovery time, boost energy levels, improve joint health, and enhance sexual performance, Defendants' representations and omissions were a material factor in influencing Plaintiff's decision to purchase the IGF-1 Plus products.

---

[12] *See, e.g.*, Rinaldi et al., *Insulinlike growth factor (IGF)-1 administration ameliorates disease manifestations in a mouse model of spinal and bulbar muscular atrophy*, 6;18:1261-8 Mol. Med. (Dec. 2012) ("Our results suggest that peripheral tissue can be targeted [with IGF-1 injections] to improve the spinal and bulbar muscular atrophy phenotype and indicate that IGF-1 warrants further investigation in clinical trials as a potential treatment for this disease."); Brown, *Commercial challenges of protein drug delivery*, 2(1):39-40 Expert Opin. Drug Deliv. (2005) ("The commercial success of protein delivery via the oral or nasal routes has been limited to . . . . small peptides with relatively low daily doses.  There has not been much success with larger proteins due to the relatively low bioavailability observed for the oral and nasal routes.  Therefore, with today's technologies, one must remain skeptical with regard to oral delivery of proteins with a molecular size of insulin and greater."); Rabinovsky et al., *Targeted expression of IGF-1 transgene to skeletal muscle accelerates muscle and motor neuronregeneration*, Faseb J. (Nov. 1, 2002) ("Exogenously administered IGF-1 protein can accumulate at the neuromuscular junction.  Therefore, enhanced nerve growth in IGF-1 transgenic mice could be a result of multiple targeting to motor neurons, Schwann cells, and the neuromuscular junction.  Taken together, we show that IGF-1 acts at diverse stages of nerve and muscle regeneration process . . . .  These findings strengthen the concept that IGF-1 can be used as a muscle-based gene therapy to enhance the functional innervation and regeneration of skeletal muscle after an acute nerve injury."); Mizrock, *Oral GH spray: outcome-based research study*, Waveland Wellness Center, Chicago, Ill. (1998) (this study was conducted on eighteen subjects, ages thirty to sixty-five, and thirteen of the subject had increased IGF-1 levels, but it was not a placebo-controlled, randomized trial); Kimura et al., *Gastrointestinal absorption of recombinant human insulin-like growth factor-I in rats*, 283(2):611-8 J. Pharmacol. Exp. Ther. (Nov. 1997) (this study investigated the gastrointestinal absorption of rhIGF-1 in rats and found that while a significant amount of rhIGF-1 was absorbed, the bioavailability was 9.3%, and that "[w]hen the initial concentration was 405.2 ng/ml, the absorption rate was 54.2 ± 6.5 ng/min/20 cm," or approximately 13%); Hill et al., *Actions of an IGF-I-enhancing antibody on IGF-I pharmacokinetics and tissue distribution: increased IGF-I bioavailability*, 152(1):123-30 J. Endocrinol. (Jan. 1997) ("We suggest that administration of IGF-I in conjunction with a binding molecule similar to the [anti-IGF-I immunoglobulin] antibody described here could provide the basis for effective IGF-I treatment strategy."); Xian et al., *Degradation of IGF-I in the adult rat gastrointestinal tract is limited by a specific antiserum or the dietary protein casein*, 146(2):215-25 J. Endocrinol. (Aug. 1995) ("It can be concluded that IGF-I cannot be expected to retain bioactivity if delivered orally because of rapid proteolysis in the upper gut, but the use of IGF antibodies and casein could represent useful approaches for IGF-I protection in oral formulae.").

There is no other reason for Plaintiff to have purchased the IGF-1 Plus products, and Plaintiff would not have purchased them had he known they were ineffective and that Defendants did not possess competent scientific evidence to support the claims they made about the IGF-1 Plus products.

37.    As a result, Plaintiff and the Class members have been damaged in their purchases of the IGF-1 Plus products and have been deceived into purchasing products that they believed, based on Defendants' representations, were proven to be effective in building muscle, speeding recovery time, boosting energy levels, improving joint health, and enhancing sexual performance, when, in fact, they are not.

38.    Defendants, by contrast, reaped enormous profits from their false marketing and sale of the IGF-1 Plus products.

## CLASS DEFINITION AND ALLEGATIONS

39.    Plaintiff brings this action on behalf of himself and all others similarly situated pursuant to Rule 23(a), (b)(2), and (b)(3) of the Federal Rules of Civil Procedure and seeks certification of the following Class:

**All persons who purchased the IGF-1 Plus products in California**.

Excluded from the Class are Defendants, their parents, subsidiaries, affiliates, officers, and directors, those who purchased the IGF-1 Plus products for the purpose of resale, and those who assert claims for personal injury.

40.    ***Numerosity***. Members of the Class are so numerous and geographically dispersed that joinder of all Class members is impracticable.  Plaintiff is informed and believes, and on that basis alleges, that the proposed Class contains many thousands of members.  The precise number of Class members is unknown to Plaintiff.

41.    ***Existence and Predominance of Common Questions of Law and Fact***. Common questions of law and fact exist as to all members of the Class and predominate over questions affecting only individual Class members.  The common legal and factual questions include, but are not limited to, the following:

i. Whether Defendants had competent scientific evidence to support each of the claims they made about the IGF-1 Plus products;

ii. Whether the claims discussed herein that Defendants made about the IGF-1 Plus products were or are misleading, or reasonably likely to deceive;

iii. Whether Defendants' alleged conduct violates public policy;

iv. Whether the alleged conduct constitutes violations of the laws asserted herein;

v. Whether Defendants engaged in false and misleading advertising;

vi. Whether Plaintiff and Class members have sustained monetary loss and the proper measure of that loss;

vii. Whether Plaintiff and Class members are entitled to restitution, disgorgement of Defendants' profits, declaratory and/or injunctive relief; and

viii. Whether Plaintiff and Class members are entitled to an award of compensatory damages.

42.   ***Typicality***.   The claims asserted by Plaintiff in this action are typical of the claims of the members of the Class, as the claims arise from the same course of conduct by Defendants, and the relief sought is common to all Class members.  Plaintiff and Class members suffered uniform damages caused by their purchases of the IGF-1 Plus products which were manufactured, marketed, and sold by Defendants.

43.   ***Adequacy of Representation***.   Plaintiff will fairly and adequately represent and protect the interests of the members of the Class.  Plaintiff has retained counsel competent and experienced in both consumer-protection and class-action litigation.

44.   ***Superiority***.   A class action is superior to other available methods for the fair and efficient adjudication of this controversy.  The expense and burden of individual litigation would make it impracticable or impossible for proposed Class members to prosecute their claims individually.  It would thus be virtually impossible for the Class, on an individual basis, to obtain effective redress for the wrongs done to them.  Furthermore,

even if Class members could afford such individualized litigation, the court system could not.  Individualized litigation would create the danger of inconsistent or contradictory judgments arising from the same set of facts.  Individualized litigation would also increase the delay and expense to all parties and the court system from the issues raised by this action.  By contrast, the class-action device provides the benefits of adjudication of these issues in a single proceeding, economies of scale, and comprehensive supervision by a single court, and presents no unusual management difficulties under the circumstances here.

45.    In the alternative, the Class also may be certified because Defendants have acted or refused to act on grounds generally applicable to the Class thereby making final declaratory and/or injunctive relief with respect to the members of the Class as a whole appropriate.

## COUNT I

### Violation of the Consumers Legal Remedies Act –Civil Code § 1750, *et seq.*

46.    Plaintiff re-alleges and incorporates by reference the allegations contained in the paragraphs above as if fully set forth herein.

47.    Plaintiff seeks preliminary and permanent injunctive and equitable relief on behalf of the entire Class, on grounds generally applicable to the entire Class, to enjoin and prevent Defendants from engaging in the acts described, and requiring Defendants to provide full restitution to Plaintiff and Class members.

48.    Unless a Class is certified, Defendants will retain monies that were taken from Plaintiff and Class members as a result of their conduct.  Unless a Class-wide injunction is issued, Defendants will continue to commit the violations alleged, and the members of the Class and the general public will continue to be misled.

49.    This cause of action is brought under the Consumers Legal Remedies Act, California Civil Code § 1750, *et seq.* (the "Act").  Plaintiff and the proposed Class are consumers as defined by California Civil Code § 1761(d).  Defendants' IGF-1 Plus products are goods within the meaning of the Act.

50.    Defendants violated and continues to violate the Act by engaging in the following practices proscribed by California Civil Code § 1770(a) in transactions with Plaintiff and the Class which were intended to result in, and did result in, the sale of the IGF-1 Plus products:

(5)    Representing that [the IGF-1 Plus products] have . . . approval, characteristics, . . . uses [and] benefits . . . which [they do] not have . . . .

*       *       *

(7)    Representing that [the IGF-1 Plus products] are of a particular standard, quality or grade . . . if [they are] of another.

*       *       *

(9)    Advertising [the IGF-1 Plus products] . . . with intent not to sell them as advertised.

*       *       *

(16)   Representing that [the IGF-1 Plus products have] been supplied in accordance with a previous representation when [they have] not.

51.    Defendants violated and continue to violate the Act by representing and failing to disclose material facts on Defendant Nutronics's website regarding the IGF-1 Plus products as described above when they knew, or should have known, that the representations were false and misleading, and that the omissions were of material facts.

52.    Pursuant to § 1782(d) of the Act, Plaintiffs and the Class seek a court order enjoining the above-described wrongful acts and practices of Defendants and for restitution and disgorgement.

53.    Pursuant to § 1782 of the Act, Plaintiffs notified Defendants in writing by certified mail of the particular violations of §1770 of the Act and demanded that Defendants rectify the problems associated with the actions detailed above and give notice to all affected consumers of Defendants' intent to so act.  A copy of the letter is attached hereto as Exhibit B.

54.     If Defendant fails to rectify or agree to rectify the problems associated with the actions detailed above and give notice to all affected consumers within 30 days of the date of written notice pursuant to § 1782 of the Act, Plaintiff will amend this complaint to add claims for actual, punitive, and statutory damages, as appropriate.

55.     Defendants' conduct is malicious, fraudulent, and wanton, and provides misleading information.

56.     Pursuant to § 1780(d) of the Act, attached hereto as Exhibit C is the affidavit showing that this action has been commenced in the proper forum.

## COUNT II

### Violation of Business & Professions Code § 17200, *et seq*.

57.     Plaintiff re-alleges and incorporates by reference the allegations contained in the paragraphs above as if fully set forth herein.

58.     As alleged herein, Plaintiff has suffered injury in fact and lost money or property as a result of Defendants' conduct because he purchased the IGF-1 Plus products.

59.     In the course of conducting business, Defendants committed unlawful business practices by, *inter alia*, making the representations (which also constitute advertising within the meaning of § 17200) and omissions of material facts, as set forth more fully herein, and violating Civil Code §§ 1572, 1573, 1709, 1711, 1770, Business & Professions Code §§ 17200, *et seq.*, 17500, *et seq.*, and the common law.

60.     Plaintiff and the Class reserve the right to allege other violations of law, which constitute other unlawful business acts or practices.  Such conduct is ongoing and continues to this date.

61.     Defendants' acts, omissions, misrepresentations, practices and non-disclosures as alleged herein also constitute "unfair" business acts and practices within the meaning of Business and Professions Code § 17200, *et seq.*, in that their conduct is substantially injurious to consumers, offends public policy, and is immoral, unethical,

oppressive, and unscrupulous, as the gravity of the conduct outweighs any alleged benefits attributable to such conduct.

62.    As stated in this complaint, Plaintiff alleges violations of consumer protection, unfair competition and truth in advertising laws resulting in harm to consumers.   Plaintiff asserts violations of the public policy of engaging in false and misleading advertising, unfair competition, and deceptive conduct towards consumers. This conduct constitutes violations of the unfair prong of Business & Professions Code § 17200, *et seq.*

63.    There were reasonably available alternatives to further Defendants' legitimate business interests, other than the conduct described herein.

64.    Defendants' claims, nondisclosures and misleading statements, as more fully set forth above, are also false, misleading, and/or likely to deceive the consuming public within the meaning of Business & Professions Code § 17200, *et seq.*

65.    Defendants' conduct caused and continues to cause substantial injury to Plaintiff and the other Class members.   Plaintiff has suffered injury in fact and has lost money as a result of Defendants' unfair conduct.

66.    Plaintiff, on behalf of himself, and all other similarly situated California residents, seeks restitution of all money obtained from Plaintiff and the members of the Class collected as a result of unfair competition, an injunction prohibiting Defendants from continuing such practices, corrective advertising, and all other relief this Court deems appropriate, consistent with Business & Professions Code § 17203.

## COUNT III

### Breach of Express Warranty

67.    Plaintiff re-alleges and incorporates by reference the allegations contained in the paragraphs above as if fully set forth herein.

68.    Plaintiff, and each member of the Class, formed a contract with Defendants at the time Plaintiff and the other members of the Class purchased the IGF-1 Plus products.   The terms of that contract include the promises and affirmations of fact made

by Defendants on the Nutronics's website regarding the IGF-1 Plus products, as described above.  These representations constitute express warranties, became part of the basis of the bargain, and are part of a standardized contract between Plaintiff and the members of the Class on the one hand, and Defendants on the other.

69.   All conditions precedent to Defendants' liability under this contract have been performed by Plaintiff and the Class.

70.   Defendants breached the terms of this contract, including the express warranties, with Plaintiff and the Class by not providing IGF-1 Plus products that could deliver the benefits described above, which was the only reason Plaintiff and Class members purchased the IGF-1 Plus products.

71.   As a result of Defendants' breach of warranty, Plaintiff and Class members have been damaged in the amount of the purchase price of the IGF-1 Plus products they purchased.

## PRAYER FOR RELIEF

Wherefore, Plaintiff prays for a judgment:

A.   Certifying the Class as requested herein;

B.   Awarding Plaintiff and the proposed Class members damages;

C.   Awarding restitution and disgorgement of Defendants' revenues to Plaintiff and the proposed Class members;

D.   Awarding declaratory and injunctive relief as permitted by law or equity, including enjoining Defendants from continuing the unlawful practices as set forth herein, and directing Defendants to identify, with court supervision, victims of their conduct and pay them restitution and disgorgement of all monies acquired by Defendants by means of any act or practice declared by this Court to be wrongful;

E.   Ordering Defendants to engage in a corrective advertising campaign;

F.   Awarding attorneys' fees and costs; and

G.   Providing such further relief as may be just and proper.

Case No.                                               20

**JURY DEMAND**

Plaintiff demands a trial by jury on all issues so triable.


Dated:  March 17, 2014                    **CARPENTER LAW GROUP**

                                By:  */s/ Todd D. Carpenter*
                                    Todd D. Carpenter (CA 234464)
                                    402 West Broadway, 29th Floor
                                    San Diego, California 92101
                                    Telephone: 619.756.6994
                                    Facsimile: 619.756.6991
                                    todd@carpenterlawyers.com

                                **PATTERSON LAW GROUP**
                                James R. Patterson (CA 211102)
                                402 West Broadway, 29th Floor
                                San Diego, California 92101
                                Telephone: 619.756.6990
                                Facsimile:  619.756.6991
                                jim@pattersonlawgroup.com

                                Attorneys for Plaintiffs